NO. _____

FILED

2017 FEB 22 P 1: 24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

ALEX SALVAGNO,

Petitioner,

v.

DIRECTOR, BUREAU OF PRISONS,

Respondent.

---

MEMORANDUM IN SUPPORT OF PETITION FOR A WRIT
OF HABEAS CORPUS UNDER 28 USC § 2241

---

Alexander Salvagno, Pro Se
11212-052
Federal Correctional Institution
33½ Pembroke Road
Danbury, Ct 06811

TABLE OF CONTENTS

JURISDICTION ....................................................1

EXHAUSTION OF ADMINISTRATIVE REMEDIES .........................2

PRELIMINARY STATEMENT .........................................2

BACKGROUND ....................................................5

ARGUMENT .....................................................16

1. BOP'S POLICY ON COMPASSIONATE RELEASE, WHICH ESTABLISHED A
   MORE RESTRICTIVE CRITERIA THAN CONGRESS INTENDED IT TO
   CONSIDER, WAS AN IMPROPER EXERCISE OF BOP'S RULEMAKING
   AUTHORITY, BECAUSE BOP'S INTERPRETATION OF THE RELEVANT
   STATUTES IS CONTRARY TO THE PLAIN LANGUAGE, NOT SUPPORTED
   BY THE LEGISLATIVE HISTORY, UNREASONABLE AND RENDERS THE
   STATUTES UNWORKABLE .......................................16

   A. Summary of Ground .....................................16

   B. Review Standard .......................................17

   C. Statutory Interpretation Demonstrates Clear Congressional
      Intent As To The Precise Question ....................17

   D. BOP's Interpretation And Process Has Been Criticized
      By Government Agencies As "Ad Hoc", Broken, Unworkable
      And Unreasonable .....................................24

   E. BOP's Interpretation Is Unreasonable, Inconsistent With
      Congressional Intent, And Unworkable, And Therefore
      Not Entitled To Difference ...........................27

2. BOP FAILED TO EXERCISE ITS DISCRETION IN ACCORDANCE WITH
   THE RELEVANT STATUTES BY FAILING TO BRING A RIS MOTION
   WHERE SALVAGNO SQUARELY MEETS THE ELIGIBILITY ESTABLISHED
   BY CONGRESSIONAL DELEGATION TO THE COMMISSION ............34

3. BOB ABUSED ITS DISCRETION BY COMMITTING AN ERROR OF LAW
   AND BASING ITS DENIAL OF SALVAGNO'S REQUEST ON FACTORS
   WHICH CONGRESS DID NOT INTEND IT TO CONSIDER .............35

4  BOB ABUSED ITS DISCRETION BY BASING ITS DECISION TO DENY
   SALVAGNO's REQUEST ON CLEARLY ERRONEOUS FACTUAL FINDINGS
   AND OTHERWISE RELYING ON INACCURATE AND UNRELIABLE
   INFORMATION WHICH HE DID NOT HAVE AN OPPORTUNITY TO
   CORRECT ..................................................36

5. BOP ABUSED ITS DISCRETION IN FAILING TO FOLLOW ITS OWN
   REGULATIONS BY DEFERRING TO THE US ATTORNEY BEFORE MAKING
   ITS DECISION ..............................................41

6. THE ABOVE ACTS AND OMISSIONS VIOLATE THE CONSTITUTION'S
   SEPARATION OF POWERS PRINCIPLES AND DUE PROCESS CLAUSE ....42

REQUESTED RELIEF ..............................................43

REASONABLE PROBABILITY THAT REQUESTED RELIEF WILL RESULT IN
A DIFFERENT OUTCOME ...........................................44

MISCARRIAGE OF JUSTICE ........................................46

CONCLUSION ....................................................47

VERIFICATION ..................................................47

United States District Court
District of Connecticut
_____ X

Alex Salvagno,

    Petitioner,

       v.                                    Case No. _____

Director, Bureau of Prisons,

    Respondent.
_____ X


MEMORANDUM IN SUPPORT OF PETITION FOR A
WRIT OF HABEAS CORPUS UNDER 28 USC § 2241

Alex Salvagno, the pro se petitioner, submits this memorandum in support of his petition for habeas corpus (28 USC Sec 2241) and for Administrative Procedures Act "APA" (5 USC Sec 701 et seq) relief.

JURISDICTION

1.  Section 2241 jurisdiction is proper because Salvagno, a federal prisoner confined at FCI Danbury, Connecticut, challenges the manner of execution of his sentence.  In particular, he challenges the Bureau of Prisons' "BOP" policy and decision on his request for a reduction in sentence "RIS", and other BOP actions as an abuse of discretion, in excess of statutory authority, and violative of the laws and constitution of the United States.

2.  Challenges to the execution of a sentence typically, properly, include matters such as computations of good time credit and other means of shortening sentences that are administered by prison officials.  See Jimian v Nash, 245 F.3d 144, 146 (2nd Cir 2001); Fed. Habeas Corpus Prac. & Proc. Sec 41.2(b) at 1185-1188.

3.  APA jurisdiction is proper because Salvagno is challenging BOP

1

actions as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. See section 706(2)(A)

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.  Salvagno has not administratively appealed the BOP OGC denial of his RIS request, nor his challenge to BOP's interpretation of the relevant statutes, because to do so would be futile and would cause irreparable injury.

5.  The BOP OGC's denial constitutes a final administrative decision which is not appealable through the Administrative Remedy Procedure.  See 28 CFR Sec 571.63.

6.  The challenged interpretation and policy is the result of a directive from the Department of Justice "DOJ" that BOP is powerless to change. See Richmond, 387 F.3d at 603 ("Because the [BOP] is a unit within the [DOJ], the OLC's opinion governs the Bureau's conduct").

7.  Exhaustion (after having waited nearly two years for a decision on his RIS request) could cause Salvagno and his children irreparable injury. See NY v Sullivan, 905 F.2d 910, 918 (2nd Cir 1990)("Waiver may be involved when ... the enforcement of the exhaustion requirement would cause the claimants irreparable injury").

## PRELIMINARY STATEMENT

8.  Salvagno, is a federal inmate who was sentenced to 300 months for non-violent crimes related to the operation of his asbestos abatement company.  Throughout his more than 11 years of incarceration, he has maintained an extraordinary record of post-conviction rehabilitation, despite extremely difficult family circumstances.

9.  Salvagno and his wife, Rebecca Salvagno, had three children (ASjr, AS and NS) born in 2000, 2001, and 2005.  Their oldest son, ASjr, has severe

disabilities (including Vater syndrome, Aspergers syndrome, and other mental health issues) requiring full-time medical care, which Rebecca provided after Salvagno was incarcerated.

10.   However, Rebecca died in November 2014.  After spending nearly a year with neighbors, AS and NS were moved to Tennessee to live with their maternal uncle, while ASjr was moved into foster care in upstate NY(with a retired nurse) in October 2015, as there were no family members (other than Salvagno who has medical training) capable of providing for his special care needs.  In about May 2016, the two younger children were split, with AS remaining in Tennessee, and NS was move to a non-family member friend of Rebecca's in Georgia.

11.   Since Salvagno had no other care options for ASjr, other than himself which is not possible due to his incarceration, the state brought a neglect proceeding against him in Family Court, and issued notices that if ASjr remained in foster care for more than 15 months, it may be required by state law to commence termination of parental rights proceedings.  DCYF eventually withdrew its petition after concluded that it was in ASjr's best interest to leave foster care as quickly as possible, and that the best chance for him to do that was for Salvagno to be granted compassionate release from prison to care for his children.  The Family Court set a reunification date for December 2, 2016, but it also cautioned that if ASjr remains in foster care for more than 15 months, the Department may be required by law to move for termination of parental rights.

12.   Shortly after Rebecca's passing, Salvagno submitted a compassionate release, reduction in sentence "RIS" request to the FCI Warden in March 2015, who on April 29, 2015, after having conducted a two part investigation, involving various staff and US Probation in Albany, and in April 2015, issued a letter to BOP's General Counsel recommending Salvagno's request be granted.

3

13.   A few months later in about October 2015, the General Counselor's deferred the matter to the US Attorney's office to gather information and provide an opinion as to whether Salvagno's request should be granted.  On December 29, 2016, nearly two years after Warden Quay recommendation to grant Salvagno's request, the General Counsel denied the same.

14.   As established below, this petition presents serious challenges BOP's policy and decision which sufficiently show those actions are arbitrary, capricious, an abuse of discretion, beyond its authority, and violative of the laws and constitution of the United States.

15.   But this Court should not overlook the fact that what is at stake here for Salvagno personally is of much greater importance and impacts matters affecting his children's well being, placement and care, as well as the potential destruction of what remains of the family unit.  The urgency of the circumstances at hand warrant expediting this habeas proceeding in conformity with controlling precedent that matters affecting a child's placement and care "must be treated by ... courts ... as matters of urgency". Blondin v Dubois, 189 F.3d 240, 244, n.1 (2nd Cir 1999); Id at 244 ("in light of the importance of deciding matters affecting children as expeditiously as possible ... it is unfortunate that neither party requested that this matter be briefed and argued on an expedited basis").

16.   Salvagno implores the Court to help his children (whose voices are lost to a system, which as established below, has been deemed broken by government witnesses and the Department of Justice's Office of the Inspector General), by expediting the judicial resolution of this matter, and in weighing the factors to consider the words of Carol LaFleur, executive director of the NE Kidney Foundation, who on May 2, 2016, wrote the US Attorney's office to recount ASjr's medical and developmental issues, and psychological consequences resulting from the combination of risk factors in his life.  She states in part that ASjr:

"has suffered multiple losses - his mother; his siblings, his sense
of normalcy in his school setting; the abandonment of other relatives
due to his illnesses.  My greatest concern for [him] is what will happen
when he turns 18 and is no longer eligible for care through the foster
care system ... he will not have the life skills necessary to be on his
own at that time.  Should anything at all compromise [his] health, he
may risk his kidney rejecting.  If his kidney were to fail, he would
need to undergo dialysis treatment again, which is very taxing not to
mention a very costly treatment to our healthcare system.  Combined with
the other issues [he] lives with, the loss of his mother as his primary
caregiver, the loss of his siblings, and now being displaced into
a foster care environment, [he] has endured more than any child should
have to, especially when there is another parent able to care for him.
Added to his medical condition are the issues associated with Mr.
Salvagno's incarceration.  Studies show a direct correlation to
incarceration of a parent.  These can lead to behavioral problems,
difficulty in cognitive development, difficulty in forming and
regulating emotions later in life.  Because the losses [ASjr] has
suffered, I fear that he may be internalizing his feelings of abandonment
and isolation and I also worry that he is susceptible to depression and
anxiety.  [ASjr] will also eventually need a kidney transplant ... [he]
has endured enough.  Not only does he continue to live with multiple
serious medical conditions, but his life as he knew it has been turned
completely upside down.  He lost his mother; he lost his siblings; his
father has been away most of his life and know he has been placed into
foster care where the other children in the home are toddlers.  I have
known [ASjr] and his siblings for many years.  I knew [his] mom very,
very well.  She was a champion for her children and would want the best
possible outcome for [ASjr] and his siblings.  Mr. Salvagno being
released to care for them IS the best possible outcome.  He has a
network of support available to him, a job waiting for him, a home
to live in and he would be able to care for [ASjr] immediately and
provide the nurturing that is as much a necessary part of his
healthcare as the medications he must take ...".  Exhibit 1.

17.  Salvagno's children have been without a parent for 28 months.  The

December 2, 2016 date set by Family Court for reunification has already

passed, and beyond the time set by NY law for termination of parental rights,

since ASjr has been in foster care for more than 15 months.  Moreover, ASjr

has been subjected to multiple hospitalizations since Rebecca passed, in some

instances, because mistakes were made in his care, which may have damaged his

one donated kidney.


BACKGROUND

18.  In December 2004, Salvagno was sentenced by the US District Court

(NDNY) to a sentence of 300 months after having been convicted on a number of

criminal counts including racketeering conspiracy, conspiracy to violate the

clean air and toxic substances acts, multiple violations of the clean air act, and income tax evasion, arising out of his operation of his asbestos abatement business, and none involving violent acts.

19.  At sentencing, doctors, specialists and persons with knowledge informed the court about (a) ASjr's severe and pervasive medical, physical and developmental problems; (b) why the loss of Salvagno's caretaking and financial support would exceed the harm ordinarily incident to incarceration for similarly situated defendants; and (c) how Salvagno's wife would not be able to take the extreme pressure, break down and be toppled, if left to care for ASjr on her own on top of all the other parental, household, and financial obligations. See US v Salvagno, USDC NDNY, 02-cr-51, Dkt 395 at pgs 117-139.

20.  Salvagno requested a downward departure based on extraordinary family circumstances (Dkt 395 at 115-159) but the court, based on the government's opposition, denied the request and imposed a guidelines sentence of 300 months. See USDC NDNY TR 12/21/04 and 12/23/04 hearing.

21.  In 2010, after a dramatic decrease in renal function, the Boston Children's Hospital determined it was time from ASjr to receive a kidney transplant, and placed him on dialysis.  At this time, Salvagno sought a furlough to donate his kidney for the transplant.  The BOP and the US Attorney's office (NDNY), in a submission filed under seal on August 5, 2010, told the court (NDNY) "the procedure may someday need to be performed ... [but] there is no present need for the operation, let alone urgency." Dkt 894 at 2 (sealed).  This representation was a gross mis-assessment of ASjr's dire medical needs based on erroneous representations made BOP's staff at FCI Fort Dix.  Id at Exhibit 2.  Salvagno's furlough request was denied based on the government's representations.  In October 2010, less than three months after the BOP/US Attorney's office mis-assessment that there was no need, let alone

urgency for the operation, ASjr received an emergency transplant.  The fact
he underwent an emergency transplant within three months of the government's
claim that there was no present need for the surgery, let alone urgency,
establishes that both agencies mis-assessed ASjr's medical condition and
needs to the point of placing him at medical risk, and leaving him in a
position where he had to receive an inferior non-living donor kidney with a
life span of less than half that of a living related donor kidney.  See
Exhibit 1, letter for Carol LaFleur, Exec Director, NE Kidney Foundation, in
which she writes "ASjr has had his kidney for six years,more than half the
expected time for a transplant from a deceased donor to thrive ... a kidney
received from a living, related donor is always better, with statistics
indicating longevity of twenty years or more".  Id.  The significance of
this information is relevant to demonstrate that neither BOP nor the US
Attorney's office have the requisite special expertise, competence or
experience to assess matters involving ASjr's complex medical and
developmental issues and needs, as is material to the arguments made below.

     22.  The cumulative nature of their hardships were such that Salvagno's
sentence, although within the guideline range, impacted his family so
severely that the emotional, physical and financial toll led to a destructive
dependency in an effort to cope with her situation, which ultimately took
Rebecca's life.  On November 2, 2014, after years of extreme stress,
depression, and frustration, Rebecca passed away in her sleep at age 49,
leaving behind their three minor children.  At that time, there were no
family members willing to take the three children, and it was clear that no
relatives were capable by reason of lack of training, knowledge or experience
to care for ASjr.  The children were placed with temporary caregivers, "the
Bogarts".

     23.  On about March 30, 2014, Salvagno submitted to the FCI Danbury
Warden a request for compassionate release with voluminous supporting

documents, which demonstrate particularly extraordinary and compelling circumstances (i.e., Rebecca passed away leaving their children, and in particular, ASjr, without a capable family member caregiver) which warrants a RIS motion pursuant to 18 USC Sec 3582(c)(1)(A)(i), 28 USC Sec 994(t) and USSG 1B1.13.  Exhibit 2 (Salvagno's RIS request).  The request - with supporting evidence from medical specialists and family members - made a prima facie showing that there is no other family member capable of caring for ASjr because (a) ASjr was born with extraordinary and complex medical and developmental ailments; (b) Salvagno and Rebecca are the only family members medically trained in every phase of ASjr's care, and the only family members with specific knowledge of the combination of ailments affecting ASjr and past treatments critical to his continued survival; and (c) no other family members have medical training or knowledge and are therefore incapable of caring for ASjr.  The request also showed, with supporting evidence, that Salvagno has a viable release plan (including housing, and the financial means to care for the children upon release), that he maintained a loving nurturing relationship with strong emotional bonds with his children, that his release to care for his children is in the children's best interest and would pose no danger to the safety of any other person or the community. Id.

24.  A request to expedite the RIS review process was also submitted on March 30, 2014. Exhibit 3.  This was based on extreme risk to ASjr because the Bogarts and the support network around them were not capable of providing appropriate medical care for ASjr. Id.  The RIS request was supplemented on May 28, 2016.  Exhibit 4.

25.  On April 29, 2014, after finding particularly extraordinary and compelling reasons to grant the request, the warden (after conducting the two stages and investigations pursuant to BOP Program Statement 5050.49 Secs 5 and 7, and obtaining a recommendation from US Probation and pretrial Services approving Salvagno's release and employment plan) issued a letter to BOP

General Counsel, Office of General Counsel, "OGC", recommending that Salvagno's request be granted. Exhibit 5.

26.  In May 2015, the law firm of Couch White, LLP, agreed to represent Salvagno pro bono to make contact with OGC with respect to the RIS request. Couch White wrote to OGC to inform them of the urgency of the circumstances and to offer assistance in obtaining any other information that OGC may need.

27.  On about May 29, 2015, an associate general counsel "AGC" from OGC called Couch White and informed them that she was responding to the their letter, that OGC was aware of Salvagno's request, that the request was being processed but that it would not be a short process despite the urgency.  The issues expressed by the AGC was that there were new rules that put BOP in the position of having to investigate not only prior judicial and incarceration records, but records in the community relating to Rebecca's death and to the children, and BOP was not accustomed to being in that role, very few motions make it past the wardens to the OGC, plus the rules have changed and they were still navigating them, and she would let Couch White know if there was any additional information needed.

28.  Over the next few months, Couch While wrote follow up letters to OGC to inform them of rapidly changing circumstances and left several messages requesting a status of the process but OGC did not return their calls nor otherwise communicate with them to advise whether there were any issues regarding the request or showing necessary for BOP to file the RIS motion.

29.  In October 2014, Salvagno learned from staff at FCI Danbury that OGC sought the opinion of the US Attorney's office (NDNY) on his request, and that AUSA Elizabeth Coombe had contacted the facility requesting information.  Couch White then contacted AUSA Coombe and over the next few

months communicated with her on several occasions to inform her of the rapidly changes circumstances. At no time, prior to the filing a motion to compel in the sentence court, did the US Attorney's office advise that there were any potential issues as to whether Salvagno met the eligibility criteria for BOP to file the RIS motion.

30. A second supplement and renewed request to expedite was made on October 2, 2015 -- informing OGC that the Bogarts made clear they are incapable of caring for ASjr's medical needs and could no longer continue to care for his children which caused the children to be split up, and further explaining that:

> "Rebecca (now deceased) and [Salvagno] are the only family members who can safely, consistently and substantially manage [ASjr's] care because [they] are the only ones who have the medical training, skill, experience, proven track record, knowledge and capacity (extraordinary amount of time, dedication, and unconditional commitment) to do so". Exhibit 6.

31. The children's maternal uncle agreed to take the younger boy, NS, and daughter, AS, to live with him in Tennessee, but he refused to take ASjr, due to his stated inability to care for his special needs. As no relative was willing or able to care for ASjr, he was placed by the Department of Children, Youth and Families ("DCYF") in a foster home in Schenectady, NY.

32. A third supplement and renewed request to expedite the RIS request was made to OGC on October 22, 2015, providing, inter alia, the following additional information from Salvagno's Family Court attorney:

> "[Salvagno's] wife's family members refused to care for ASjr because they were unable to care for his substantial medical needs and Asperger's syndrome ... ASjr was left with temporary caregivers, who at the ... family court proceeding withdrew their petition, resulting in the temporary custody order being vacated ... at that proceeding ... ASjr's court appointed counsel stated ... 'there were no family members or friends that were willing of or able to care for ASjr ... and that ASjr is not effectively a destitute child ... ASjr was ... placed in temporary foster care ... in investigating placement options for ASjr, it appears he 'falls through the cracks' ... his medical needs are so substantial that regular foster care placement is extremely difficult ...". Exhibit 7.

33.   In October 2015, the DCYF brought a neglect petition in NYS Family Court, Albany County, against Salvagno alleging he failed to properly supervise ASjr, and failed to have a realistic and feasible plan for ASjr's care following the deterioration of the temporary care situation with the Bogarts.   Salvagno's Family Court appointed counsel advised him that the neglect proceeding is a procedural mechanism invoked to allow children to be taken in and cared for by the State, and a "technical" not "purposeful" neglect due to the fact that Salvagno is not available to care for ASjr due to his incarceration.

34.   On October 26, 2015, Salvagno provided DCYF copies of the RIS submissions to show the agency what efforts he had made to develop an adequate care plan for his son, and shortly thereafter he filed those same documents to Family Court.

35.   By letter of December 1, 2015, DCYF notified Salvagno that "[i]f at any point in this process, the child(ren) remain(s) in foster care for 15 out of 22 months, the Department may be required by law to file a petition to terminate your parental rights".

36.   On April 16, 2016, upon information and belief that there had been no discernible action by BOP with respect to his RIS request, as recommended by the Warden one year prior, Salvagno filed a motion in the sentencing court requesting, inter alia, the court compel BOP to respond to his RIS request under the sentencing court's 28 USC 2255 jurisdiction.

37.   On May 19, 2016, DCYF filed a Permanency Report, in Family Court, which stated, inter alia, the following positions by DCYF:

(a) "Permanency Planning Goal (PPG) ... Return to Parent";

11

(b) "Reason For Placement ... Ms. LaValley and Mr. Bogart ... were refusing to continue to provide for [ASjr's] care ... Custody went back to father, Alex Salvagno ... Mr. Salvagno is currently incarcerated and unable to make appropriate plan for the care of ASjr";

(c) "Permanency Goal ... The goal for [ASjr] is Return to Parent ... Describe what needs to happen in  order for this reunification to occur ... Father has requested compassionate release, however, that request is still pending". Exhibit 8.

38.  On June 9, 2016, the Family Court held a permanency hearing, at which it ordered the Permanency Report accepted, after all parties agreed to the Permanency Report goals.  It is Salvagno's understanding that the Family Court is required to conduct a permanency hearing every six months to assess changed circumstances.

39.  On June 17, 2016, the US Attorney's Office (NDNY) filed its opposition in US District Court (NDNY) to Salvagno's motion to compel, which argued inter alia:

(a) Salvagno "is the subject of a neglect petition pending in Family Court ... trial on that petition ... is [set] for August 2016 ... [his RIS] application is currently being review by the BOP [OGC].  Although, the [Danbury] Warden recommended it be granted, it appears [he] did not test [Salvagno's] claims.  BOP has asked the US Attorney's Office to provide its opinion ... our office has been diligently gathering information about the application - and particularly the circumstances of [Salvagno's] children - by, among other things, talking to the attorney representing [ASjr].  Once all the requisite information has been obtained and considered, the application will be forwarded to the Director for review." Opposition at 3.  "There are many factors that BOP will consider, including the nature and circumstances of the offense, comments from the victims, and whether the release would minimize the severity of the offense, as well as issues involving the children, such as whether there are other family members who could care for them, and the degree to which the inmate cared for and had contact with his children before and after incarceration.  In addition, where a child is in foster care, there must be documentation verifying that the inmate will be able to immediately obtain custody of the child.  The defendant, who is the subject of a neglect proceeding, cannot provide such documentation". Id at 4.

(b)  Salvagno "plainly does not satisfy at least one of the criteria established by BOP.  Where a child is in foster care, there must be 'documentation verifying that the inmate will be able to immediately obtain custody of he child ... The defendant, who is the subject of a neglect petition pending in [NYS] Family court, cannot provide such documentation.  Unless the Family court concludes that the defendant

will be able to immediately obtain custody of the child, he cannot
satisfy this condition". Id at 8-9. "[I]t is unnecessary to address
all of the factors that BOP will consider, but there are many which
will require additional analysis. For example, the children's maternal
uncle has taken custody of two of the children, and it is unclear why
other relatives, such as the defendant's sister, cannot take custody
of the child in foster care. To the extent that the defendant claims
that he is the only family member who can care for that child because
of medical issues, he has not established that he knows how to care
for him now that his son is 11 years older than when he reported to
prison and his medical issues have changed or that others could not
be trained to do so". Id at 9, n.3.

40.  After learning of the US Attorney's position on the necessity to
obtain the above referenced Family Court ruling, Salvagno asked his Family
Court appointed counsel who advised him that it is not possible for an
incarcerated parent whose child is in foster care to obtain a prospective
ruling from a NYS Family Court, while the applicant remains incarcerated,
stating the parent will be able to obtain immediate custody of the child upon
release because there is no legal vehicle nor mechanism for Family Court to
grant such a request. Counsel further advised the most any incarcerated
parent of a child in foster care could obtain is a Permanency Report,
accepted by Family Court, after having been agreed to by all parties, which
states the permanency goal is "return to parent" and acknowledges the "Father
has requested compassionate release" which is needed for the "reunification
to occur", as is the case here.

41.  On July 5, 2016, Family Court entered an Order stating, inter alia,
that:

> after having "considered the best interest and safety of the child
> ... [it is] ordered that the Petitioner's plan for the child is approved
> as follows ... Return to Parent by December 2, 2016", but cautioning
> that if the "Child stays in foster care for 15 of the most recent 22
> months, the agency may be required by law to file a petition to
> terminate [Salvagno's] parental rights and may file before the
> end of the 15-month period".
> Exhibit 9.

42.  On July 27, 2016, Salvagno filed his reply in US District Court
(NDNY) to the government's opposition to his motion to compel and an
amendment to also invoke mandamus, All Writs Act, and APA jurisdiction under

13

28 USC Secs 1361 and 1651 and 5 USC Sec 706.

43.  On August 15, 2016, Couch White wrote to OGC to provide BOP with copies of the DCYF Permanency Report, and the Family Court's July 5, 2016 Order, to explain why the US Attorney's Office's position that Salvagno must secure an impossible to obtain order from Family Court, had created a "Catch-22" and prejudicial stalemate between the two process, and to renew Salvagno's request for BOP to expeditiously bring the RIS motion to the sentencing court. Exhibit 10.

44.  On August 24, 2016, the Family Court held a hearing on the petition for neglect previously filed by the DCYF, at which time, counsel for DCYF withdrew the petition and informed the court that this was being done to facilitate the prompt return of ASjr to his Salvagno's custody upon the granting of the RIS request.  The Family Court accepted the withdrawal, and then declared ASjr a destitute child.  The later obtained transcript shows that counsel stated, in pertinent part:

> "it's our contention that [AS''jr'] best interest would be served by leaving foster care as soon as possible.  And we believe further that the best chance for that to happen would be if his father ... were to be granted a compassionate release from prison so he could return to the community and take his son back into custody".
> Exhibit 11.

45.  On September 8, 2016, the Honorable Lawrence E. Kahn, US District Court Judge (NDNY) denied Salvagno's Motion to compel, concluding the court lacked jurisdiction to hear the claims, finding that challenges to BOP actions were not cognizable under 28 USC Sec 2255, and should be raised instead under Sec 2241, which likely must be filed in the District of Connecticut, and that it lacked Mandamus, All Writs Act, and APA jurisdiction in the criminal case.

46.  On December 23, 2016, Couch White wrote OGC to provide BOP with a copy of the transcript of the Family Court August 24, 2016 hearing, in which

14

DCYF withdrew its neglect petition, stated it was in ASjr's best interest to be returned to his father's custody as soon as possible, which the Family Court accepted. Exhibit 12.

47.   By Memorandum from the General Counsel to now FCI Warden, K. Williams, dated December 29, 2016, (the "Denial"), which was provided to Salvagno by his BOP case manager on January 6, 2017, the General Counsel denied Salvagno's RIS request. Exhibit 13.

48.   The Denial was based on the following three conclusions: first, his criminal "conduct increased the likelihood of death or serious bodily injury to at least 468 victims, a number of whom were present in contaminated elementary schools, churches and offices, and resulted in a total loss of $ 22,875,574.46"; second "two of [his] children are being cared for by their maternal uncle"; and third, "family court has directed that the third child remain in foster care". Exhibit 13.

49.   On about January 23, 2017, Salvagno forwarded a request for reconsideration to General Counsel, which, given the complexity of the issues, also asked for an opportunity for his pro bono counsel and prior sentencing counsel to speak with her to clarify why the information relied upon to deny the RIS request is inaccurate and unreliable, and why the motion should be brought to the court, which is in a unique position to effectively address the difficult issues contained therein and determine whether the clarified circumstances warrant a sentence reduction. Exhibit 14.

50.   Salvagno's reconsideration request argued that (a) he meets the eligibility criteria established by the US Sentencing Commission ("Commission"), the agency expressly tasked by Congress to establish what factors must guide BOP's decision when deciding whether to make the requisite motion (b) the Decision applied a more stringent standard (c) the Decision is based on information that is unreliable and inaccurate, which he had no prior

15

opportunity to correct (d) there is reason to believe that reconsideration and communication with counsel will result in a different outcome (e) denial will result in a miscarriage of justice and (f) denial will allow materially inaccurate information about him in BOP's records to go uncorrected to his and his children's significant detriment. Id.

51.   Salvagno supported his above reconsideration request with exhibits, which are included herein, that show why the information relied upon by BOP was unreliable or inaccurate, including Family Court orders and transcripts, and records showing that the risk predictions relied upon by the government at sentencing, not only did not conclude what BOP concluded in its Denial, but have proven false over time.   These points are raised in the below arguments.

ARGUMENT

GROUND 1:   BOP'S POLICY ON COMPASSIONATE RELEASE, WHICH ESTABLISHED A MORE RESTRICTIVE CRITERIA THAN CONGRESS INTENDED IT TO CONSIDER, WAS AN IMPROPER EXERCISE OF BOP'S RULEMAKING AUTHORITY, BECAUSE BOP'S INTERPRETATION OF THE RELEVANT STATUTES IS CONTRARY TO THE PLAIN LANGUAGE, NOT SUPPORTED BY THE LEGISLATIVE HISTORY, UNREASONABLE AND RENDERS THE STATUTES UNWORKABLE

A.   Summary Of Ground

52.   BOP Program Statement "PS" 5050.49 -- titled Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 USC Sec 3582(c)(1)(A) and 4205(g) -- is an internal policy statement adopted by BOP in connection with the decisionmaking required under Sec 3582(c)(1)(A).

53.   PS 5050.49 is an improper exercise of BOP's rulemaking authority, because it is based on an erroneous interpretation of the relevant statutes and contravenes unambiguously expressed Congressional intent that BOP's exercise of discretion, when deciding whether to make a RIS motion, be guided by the criteria Congress has identified pursuant to its delegation to the

16

United States Sentencing Commission "Commission" under 28 USC Sec 994(t).

54.   By issuing PS 5050.49, which established a different more restrictive criteria, BOP exceeded its rule making authority, relied on factors Congress has not intended it to consider in exercising its discretion, and unlawfully curtailed the agency's discretion under Sec 3582(c)(1)(A)(i).

55.   BOP therefore acted arbitrarily, capriciously, in excess of its authority, and abused its discretion, by establishing criteria that Congress did not intend for it to consider when determining whether a RIS motion should be filed under Sec 3582(c)(1)(i).

B.   Review Standard

56.   In Levin v Apker, 455 F.3d 71 (2nd Cir 2006) the Second Circuit held that BOP's policy, which disregard factors Congress intended it to consider in making a discretionary decision, was an improper exercise of its rule making authority, and it explained that such claims are reviewed according to the following standard:

> "We ... first examine whether the intent of Congress is clear as to the precise question at issue.  If traditional statutory interpretation demonstrates clear Congressional intent, that is the end of the matter, because we will not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent.  If, instead find the statute to be silent or ambiguous, we move to the second step of the Chevron analysis, and evaluate whether the agency's answer is based on a permissible construction of the statute.  We must defer to the agency's construction of the statute as long as that interpretation is reasonable". Id at 80 (internal citations omitted).

C.   Statutory Interpretation Demonstrates Clear Congressional Intent
     As To The Precise Question At Issue

     The Statutory Language

57.   The terms of the relevant statutes -- 18 USC Sec 3582(c)(1)(A) and 28 USC Sec 994(a) and 994(t) -- make clear that Congress did not delegate to

17

the BOP the authority to issue rules with the binding effect of law (particularly with respect to factors to be considered when determining whether to bring a RIS motion), nor intend to delegate exclusive authority to BOP in deciding what extraordinary and compelling reasons merit the filing of such motion.

58.   Rather, Congress gave the Commission an expressed role to decide the criteria that BOP must consider in exercising its discretion, and it gave the judiciary the penultimate authority to determine whether a person's sentence should be reduced.

59.   For the BOP to have absolute discretion in filing a RIS motion effectively deprives the judiciary of the power to grant a reduction even though the person squarely meets the criteria set forth by Congress through delegation to the Commission.

60.   Section 3582(c)(1)(A) of Title 18 permits courts to modify a term of imprisonment "upon motion of the Director of the Bureau of Prisons" when it finds that:

"(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under 3559(c) .... and a determination has been made by the Director of the [BOP] that the defendant is not a danger to any other person or the community, as provided under section 3142(g); and that such a reduction in sentence is consistent with applicable policy statements issued by the Sentencing Commission".
See 18 USC Sec 3582(c)(1)(A)(i) and (ii).

61.   Rather than explicitly define "extraordinary and compelling reasons" to guide BOP's decision on when it should file RIS Motion under Sec 3582(c)(1)(A)(i), Congress delegated to the Commission the responsibility of establishing policy statements for the sentence modification provisions of Sec 3582 and expressly directed the Commission to:

"describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list

18

of specific examples," and to develop "policy" for the "appropriate use of ... the sentence modification provisions set forth in ... 3582(c)". See 28 USC Sec 994(a)(2) and 994(t).

62.   As relevant here, the Commission defined "extraordinary and compelling" circumstances to exist in cases involving "the death or incapacitation of the caregiver of the defendant's minor child or children". See U.S. Sentencing Guidelines "USSG" Sec 1B1.13 (2016).

63.   Sections 3582 and 994 were enacted as part of the Sentence Reform Act "SRA" of 1984, requiring they be interpreted uniformly.

64.   Under this statutory scheme, Congress intended the BOP, Commission and courts to each play a role in determining whether a sentence should be modified.

(a)   Congress delegated to the Commission the responsibility, in the first instance, for determining what reasons are "extraordinary and compelling" and what criteria are to be applied in deciding their applicability in particular cases.

(b)   Congress gave the BOP the responsibility of applying the Commission's criteria in particular cases for purposes of authorizing the BOP Director to file a motion to bring a case back before the court.  And in cases involving a defendant of at least seventy years of age who served a sentence for a "serious violent felony", Congress gave the BOP the responsibility of determining whether the defendant is a danger to the safety of any other person or the community, pursuant to the factors provided in 18 USC Sec 3142(g).

(c)   Lastly, it gave the courts the responsibility of deciding whether the sentence should be reduced, taking into account both the Commission's policy statement under Sec 1B1.13 and the purposes of sentencing set forth in 18 USC Sec 3553(a).

66.   Understandably, at the time, this division of labor must have

19

seemed sensible.

(a)   The Commission was already responsible for guiding decisions on a variety of sentencing factors and was armed with data to help it set out the conditions and criteria.

(b)   The BOP was responsible for housing and monitoring all federal prisoners and could readily identify and alert the court to those who qualified.

(c)   Finally, the court, with its in-depth knowledge of each person who has come before it for sentencing, would evaluate whether the prisoner should be released early in light of the changed circumstances and the Sec 3553(a) factors.  This last assignment was the most crucial.  Congress committed that decision -- whether to reduce a sentence -- to the judge who is best suited to make that assessment.  The Court has already carefully considered the prisoner and has the information at hand to evaluate the Sec 3553(a) factors in light of the changed circumstances.

(d)   The prosecutors, moreover, can also weigh in on Sec 3553(a) factors, subject to adversarial process before the court at that juncture.

67.   Unfortunately, the process has been subverted.  The BOP has taken on all three responsibilities: it (a) established its own criteria (a mish mash of considerations) despite the fact that the task was committed by Congress, not to the BOP, but to the Commission, (b) identifies the qualified prisoners using its own criteria, and (c) determines which prisoners deserve to be released.  BOP's authority to make the RIS motion is "not a roving license to ignore the statutory text" but is instead a "direction to exercise discretion within the defined statutory limits". Massachusetts v EPA, 549 US 497, 533 (2007).

68.   That the BOP plays a role reserved by law to the courts is evidenced by the fact that the eligibility criteria set forth in PS 5050.49 includes many factors that are committed to sentencing courts, including the

nature and circumstances of the offense, comments from victims, whether release would minimize the severity of the offense, whether the inmate's release would pose a danger to the safety of any other person or the community, etc. See PS 5050.49.

69.   The BOP is not authorized, when deciding whether "extraordinary and compelling reasons" exist in a particular case, to take into account whether the defendant is "a danger to the safety or any other person or the community", or most of the other factors included in PS 5050.49.   Nowhere in Sec 3582(c)(1)(A)(i) does Congress authorize the BOP to consider such factors.   That responsibility was only given to the BOP Director under Sec 3582(c)(1)(A)(ii), the immediately succeeding subparagraph of the statute, which governs sentence reductions for certain repeat violent offenders sentenced to mandatory life under 18 USC Sec 3559(e).

70.   The textual distinction between A(i) and A(ii) by itself strongly suggests that Congress intentionally curtailed the BOP's discretion under A(i) to the criteria established by the Commission.   Rabin v Wilson-Coker, 362 F.3d 190, 196 (2nd Cir 2003)("[A] statute is to be considered in all its parts when construing any one of them.   If drafters choose to use one word in a part of a statute and limit it in another, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion"); Corley v United States, 556 US 303, 314 (2009)("One of the most basic interpretative canons[ is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superflousis, void or insignificant").

71.   Nor is the BOP authorized to consider other factors found in PS 5050.49, such as whether release of the inmate to care for the child is in the best interest of the child, or whether the inmate has obtained a Family Court conclusion that the prisoner will be able to obtain immediate custody upon release, which is impossible to obtain while the petitioner is still

incarcerated.

The Legislative History

72.   Given the clarity of the text, there should be no reason to turn to legislative history.  Such an inquiry, however, shows no congressional intent to allow the BOP to withhold a motion based on factors other than whether extraordinary and compelling reasons exist, as defined by Congress through its delegation to the Commission.

73.   The SRA legislative history, which provided for compassionate release from an otherwise final sentence, outlined the scope of the changed circumstances that would justify a court grant of early release.

74.   Accompanying sections 3582 and 994, the Senate Judiciary Committee issued a report showing that Congress intended Sec 3582(c)(1)(A)(i) to apply broadly,

> "regardless of the length of sentence, in the unusual case in which a defendant's circumstances are so changed ... that it would be inequitable to continue the prisoner's confinement"
> See Senate Report 98-225, at 121 (98th Cong., 1st Sess.)(1984).

> "changed circumstances ... would include cases of severe illness, [or] cases in which other extraordinary and compelling circumstances justify the reduction of an unusually long sentence".
> Id. at 55.

75.   The Senate Report then underscored Commissions role in establishing the relevant criteria Congress' view that sentencing power should be in the hands of the judiciary, describing the purpose of the provision's falling under section 3582(c) as "safety valves":

> "[t]he Sentencing Reform Act ... provides for court determination, subject to considerations of Sentencing Commission standards, of the question whether there is justification for reducing a term of imprisonment in situations such as those described".
> Id. at 55.

> "the value of the forms of 'safety valve' contained in this section lies

in the fact that they assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' ... the approach taken keeps the sentencing power in the judiciary where it belongs, yet permits later review of sentence in particularly compelling situations"
Id at 121.

76.   When Congress invested judges with authority to reduce sentences in accordance with policy established by the Commission, it could not have intended the DOJ to be able to withhold from judicial review cases meeting criteria that the Commission formulated pursuant to Sec 994(a) and (t).

77.   In effect, the DOJ would then both be making policy for sentence reduction and executing it.  This is fundamentally inconsistent with the expressed intent of Congress that the sentence reduction authority in Sec 3582(c)(1)(A)(i) be a "safety valve" which keeps power in the judiciary where it belongs, yet permits later review of sentences in particularly compelling situations. Id.

78.   It would therefore contravene the statutory scheme for the DOJ to operate under different or more restrictive criteria for bringing a case back to court than those established by the Commission.

79.   The Commission's authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples", and to make "policy" for the "appropriate use of ... the sentence modification provisions set forth in ... 3582(c)", see Sec 994(a) and (t), would be ineffective if the DOJ were under no obligation to recognize or apply it, and the court's authority to reduce a sentence in appropriate cases would be frustrated if cases meeting the Commission's criteria were withheld from it.

80.   A failure to provide an easily accessible safety valve subverts the legitimacy of the SRA.  The premise of the SRA is that sentence length should be determined by the courts, not the executive agencies.

81.   A policy designed to enable the sentencing court to decide whether a particular defendant's sentence should or should not be reduced for "extraordinary and compelling reasons" is entirely consistent with the principles on which the federal sentencing law is based, whereas a policy that effectively keeps such decisions away from the courts arguably undermines those principles.

D.   BOP's Interpretation And Process Has Been Criticized By Government
     Agencies As "Ad Hoc", Broken, Unworkable and Unreasonable

82.   On February 17, 2016, after hearing a series of reports from the Department of Justice Office of the Inspector General ("OIG"), calling attention to the current practices by the BOP, the US Sentencing Commission ("Commission") held a Public Hearing on Compassionate Release ("The Commission Hearing"). See Exhibit 15 at 13.

83.   The written testimony of Mary Price (General Counsel, Families Against Mandatory Minimums, FAMM), Marianne Mariana (Fed. Pub. Def's. Office, WDNY), and Margaret Love (Commission member and former US Pardon Attorney), and their oral testimony at the Commission Hearing, together with the OIG reports and the oral testimony of Michael Horowitz (Inspector General, OIG), provide substantial support for the factual and legal arguments made in this Petition.  The written testimony is available on the Commission's website.

84.   After hearing testimony and public comment as to how BOP for years has failed to use its own authority while usurping that of the Commission and the courts, Commissioner Charles Breyer stated her belief that "there is a lot of confusion based on the fact that I don't think the statute is actually workable". Exhibit 16 at 119.  Some of that testimony included

     DOJ OIG Report:   "The BOP does not properly manage the compassionate
     release program, resulting in inmates who may be eligible candidates for
     release not being considered ... the BOP has failed to provide
     adequate guidance to staff regarding the medical and nonmedical criteria
     for compassionate release consideration ... the BOP has no timeliness

24

standards for reviewing compassionate release requests ... the BOP does
not have formal procedures to inform inmates about the compassionate
release program ... as a result of these multiple failures, we concluded
that the implementation of the program is inconsistent and results in
ad hoc decision making by the BOP in response to inmate requests.  We
further found that approximately 13 percent (28 of 208) of the inmates
whose requests had been approved by a Warden ... died before their
requests were decided by the BOP Director".
Exhibit 17 at 11.


M. Horowitz (DOJ OIG):  "We found the BOP's compassionate release
program has been poorly managed and implemented inconsistently
resulting in, among other things, deaths of inmates waiting to have
their cases heard". Exhibit 18 at 66.


M. Love:   "Congress intended this statutory sentence reduction authority
to be administered primarily by the judiciary ... it designed a balanced
tripartite decision-making structure.  This Commission was tasked
under 28 USC 994(t) with defining what constitutes an extraordinary and
compelling reason warranting sentence reduction.  BOP was to identify
defendants in its custody who met the Commission's criteria and
then bring them back to the attention of the sentencing court.  The
sentencing court would then decide whether the defendant's sentence
should be modified applying the general principals of sentencing.  That's
not how it works ... BOP has played all three decision-making roles.
It applies its own policies to determine when a care warrants sentence
reduction ... [and] the United States Attorney's office have
... come to play a key role in BOP's decision-making process
frequently discouraging filings that BOP might otherwise be inclined to
make.  This is where a lot of cases get stuck ... I have heard from many
people who handled cases where a case gets stuck in the US Attorney's
office and is never heard from again ... The upshot is that what Congress
intended as a judicially-administered safety valve, a word that appears
three or four times in the legislative history, is instead controlled
by an executive agency responsible for prosecutions".
Exhibit 16 at 100-101.


M. Mariano:   "[T]he current process is broken.  Individuals who are
dying or who are desperately needed at home to care for ... sick
children are being kept in prison longer than necessary ... congress
did not intend to delegate exclusive authority to the [BOP] in deciding
what extraordinary and compelling reasons warrant a motion for a
reduced sentence.  Congress explicitly gave the Commission that role,
the role of setting the standard, and gave the judiciary the penultimate
role of determining whether a person should have a reduced sentence.
The statutory scheme is clear and the Commission must lead ... Under
the well-established principles of administrative law, the BOP's
construction of the 3582 is not entitled to deference, because Congress
spoke directly as to which agency or authority should define
extraordinary and compelling reasons, and it is this one [the
Commission].  There is no gap for the BOP to fill, no weight need be
given to its policy statements by the Commission.  Moreover, even if
it could be argued that Congress left a gap ... and the BOP has now
filled it, the decision-making process on whether or not to file a
motion is not entitled to deference because its unreasonable, which
we've outlined in greater detail in our written statement".
Id at 106-110.

M. Price:   "[T]he compassionate release process is not used as intended because the BOP has arrogated to itself the decision of whether a prisoner who otherwise meets the criteria actually deserves to be released.  Until the BOP relinquishes that role, we will continue to see stories like the ones contained in my statement of prisoners denied not because they didn't meet the criteria, but because the BOP believes they should not go home". Exhibit 20 at 129.

Commissioner R. Barkow:   "I'm curious ... where are the delays happening ... do you have a sense if there is any rhyme or reason into kind of where the bottleneck occurs?".  Exhibit 21 at 162.

85.  Ms. Price also provided a lengthy detailed account of Salvagno's case and BOP's inaction in bringing a timely motion despite the fact he squarely meets the criteria established by the Commission. Exhibit 20 at 130-135.  The significance of this is that based on this testimony concerning the facts of Salvagno's case the Commission approved changes to the US Sentencing Guidelines "USSG" policy statements on compassionate release (USSG Sec 1B1.13).

86.  On April 15, 2016, the Commission approved changes to the USSG Sec 1B1.13, which took effect on November 1, 2016, and which included the following directive:

"The Commission encourages the Director of the [BOP] to file such a motion if the defendant meets any of the circumstances set forth in Application Note 1.   The Court is in a unique position to determine whether the circumstances warrant a reduction (and if so, the amount of reduction), after considering the factors set forth in this policy statement". USSG 1.B1.13 n. 4.

87.   In announcing these changes, Chief Judge Patti B. Saris, Chair of the Commission said, "the Commission was concerned about testimony and public comment documenting that the BOP has failed to use its authority to recommend compassionate release ... We encourage BOP to use its discretion consistent with this new policy so that eligible applicants are reviewed by a trial judge". Exhibit 22

C.   BOP's Interpretation Is Unreasonable, Inconsistent With Congressional

Intent, And Unworkable, And Therefore Not Entitled To Difference

88.   As an initial matter, because Congress did not delegate to the BOP authority to issue rules with binding effect of law (particularly with respect to factors to be considered when determining whether to bring a RIS motion), and because PS 5050.49 is not formally promulgated, it should receive less deference.  See Reno v Koray, 515 US 50, 60-61 (1995)(BOP's internal agency guidelines in a program statement is akin to an interpretative rule); NYC Emp Ret Sys v SEC, 45 F.3d 7, 12-13 (2nd Cir 1995)(courts will not accord great deference to an interpretative statement which is not promulgated); Baker v Willingham, 2005 US Dist Lexis 23468 (D. Ct)(reasoning that BOP interpretations should receive less deference because Congress did not delegate to the BOP authority to issue rules with the binding effect of law).

89.   However, under Chevron USA, Inc., v NRDC, Inc., 467 US 837, 843-844 (1984), BOP's interpretation is not entitled to any deference at all because Congress spoke directly to which agency should define "extraordinary and compelling reasons" - the Commission.

90.   Indeed, if Congress meant to give BOP exclusive power over the substantive decision to file the motion, it did not need to delegate to the Commission the responsibility of defining extraordinary and compelling circumstances and making policy for the appropriate use of the sentencing modification provisions set forth in Sec 3582(c)(1)(A)(ii).

91.   Because Congress left no gap for BOP to fill on the scope of "extraordinary and compelling reasons", no weight need be given to PS 5050.49.  See Lopez v Davis, 531 US 230 (2001)(deference is owed to an agency's interpretation under Chevron if Congress left a gap for the agency to fill and the agency's interpretation is a reasonable construction of the statute)

92. Even if it could be argued that Congress left a gap for BOP to fill, BOP's decision-making process on whether to file a motion is not entitled to deference because it is unreasonable, inconsistent with Congress' intent, ad hoc and unworkable for a variety of reasons.

First, as described above, BOP's views that it has exclusive authority to decide whether to file a motion for reduction of sentence, and that it can base its decisions on a mish mash of more restrictive factors that Congress did not intend for it to consider (including factors which are impossible to meet, and which BOP does not have the special expertise, knowledge or competence to assess) is inconsistent with the relevant statutes and Congress' intent. See paras 52-87, supra; see also Lavorski v INS, 232 F.3d 124 (2nd Cir 2000)(rejecting agency interpretation of statute as unreasonable because it was inconsistent with Congress' intent).

Second, the repeated criticism by the DOJ OIG, the Commission, Government witness, etc., including that because of BOP's erroneous interpretation:

> -- the statute is unworkable;
> -- eligible candidates for release are not being considered;
> -- BOP fails to exercise its discretion;
> -- BOP's program is poorly managed and inconsistently implemented;
> -- BOP fails to provide adequate guidance to staff regarding the criteria for RIS consideration; and
> -- there is confusion, significant delays, and ad hoc decision making at every stage of BOP's process, etc.,

see paras 82 - 87, supra, shows that the process is not working as Congress intended. See Hughey v JMS Devel. Corp., 78 F.3d 1523, 1529 (11th Cir 1996)("Congress is presumed not to have intended absurd (impossible) results"); see also 2A N. Singer, Sutherland on Statutory Construction, Sec 45.12 (7th ed. 2011)("It has also been said that the construction of a statue that is unreasonable, illogical, unjust, unworkable, or inconsistent with common sense should be avoided").

28

Third, because BOP has relied on factors Congress did not intend for it to consider in deciding whether a motion should be filed for a reduction in sentence (including impossible to meet factors, which BOP does not have the special expertise, knowledge or competence to assess) its policy and resulting determinations are arbitrary, capricious, an abuse of discretion and in excess of its authority.  See e.g., Mitchel v Eastman Kodack Co., 113 F.3d 433, 442-443 (3rd Cir 1997)(finding it is arbitrary and capricious to establish criteria which creates an impossible hurdle for applicants); Mugalli v Ashcroft, 258 F.3d 52, 56 (2nd Cir 2001)(agency interpretation that goes beyond its expertise is entitled to no deference).

Fourth, BOP's policy's have circumvented the statute's mandate that the BOP Director is responsible for filing the motion.  Rather than permitting the BOP Director to exercise authority to file the motion, the process is effectively controlled by the US Attorney's office, and BOP gives final authority to the Attorney General and Deputy Attorney General - the same authorities responsible for prosecutorial policies. See Para 84, supra; 28 CFR Sec 571.62; see also Trowell v Beeler, 135 Fed Appx 590 (4th Cir 2004(finding BOP abdicated its statutory responsibility to bring independent judgment to bear on the matter by effectively delegating its statutory responsibilities to others).

88.  Some examples of the points made immediately above include the following:

First, in 18 USC Sec 3582(c)(1)(A)(ii), which governs sentence reductions for certain repeat offenders sentenced to life, Congress expressly stated BOP should consider whether the defendant is a "danger to the safety or community of any other person or the community, as provided under section 3142(g)".  However, Congress intentionally excluded that consideration from Sec 3582(c)(1)(A)(i), yet BOP's policy statement for this section nevertheless requires that "overall, for each RIS request, the BOP should

29

consider whether the inmate's release would pose a danger to any other person or the community". See PS 5050.49 at Secs 1 and 7.  Thus, PS 5050.49 expressly requires BOP to consider above all other criteria specific factors that Congress made clear should not be consider by BOP when assessing RIS requests under Sec 3582(c)(1)(A)(i). See Rabin v Wilson-Coker, 362 F.3d at 196 ("If drafters choose to use on word in a part of a statute and limit it in another, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion".

Second, the requirement that BOP assess a mish mash of factors that Congress did not intend for it to consider, such as:

    -- "whether release of the inmate to care for the inmate's child is in the best interest of the child", PS 5050.49 at Sec 5;

    -- whether the deceased "person was the only family member capable of caring for the inmate's child", Id; and

    -- "whether the inmate's release would pose a danger to the safety of any other person or the community", which includes "the nature and circumstances of the offense", PS 5050.49 Sec 7,

necessitates BOP's consideration of complex matters that are not within its special expertise, knowledge, competence or discretion to determine.  For instance, a determination of whether the inmates release to care for the child(ren) is in the child(ren) the child's best interest, and whether the deceased person was the only other family member capable of caring for the child(ren), requires a factual investigation and assessment of matters involving child development, medical, psychology, custody, placement and care of children who, as in the case here, may have severe medical and developmental issues, and therefore necessitate special care requiring medical training and knowledge by the caregiver.  And a determination of whether the inmate's release would pose a danger, which includes an assessment of the nature and circumstances of the offense, was, by BOP, made to involve an assessment of the potential medical risk to building occupants

created by Salvagno's offense, which necessitates specialized scientific and medical expertise as well as a reliable factual investigation to support such an assessment.

Third, not only does BOP not have the special expertise, competence or deference to assess the factors it established, but that problem is compounded by the fact that BOP, as concluded by the DOJ OIG, does not provide adequate guidance to staff regarding that criteria, which, as also concluded by the DOJ OIG, results in significant delays and confusion at every stage of BOP's process, ad hoc decision making, and eligible candidates for release not being considered.

Fourth, the confusion created from the lack of adequate guidance by BOP as to its mish mash of criteria for RIS request consideration here resulted in the US Attorney's Office's determination that in order for Salvagno to meet BOP's eligibility criteria, he needed to obtain a Family Court ruling that he would be able to obtain immediate custody of ASjr upon release.  This new eligibility criteria, which is clearly a factor that Congress did not intend BOP to consider, and which appears to have been implemented in ad hoc fashion by the US Attorney's office on BOP's behalf, created a impossible hurdle because no such legal vehicle or mechanism exists in NYS family courts to obtain a ruling that an incarcerated parent will be able to obtain immediate custody of his child upon release, while the applicant is incarcerated.  Moreover, in requiring this unworkable factor, the US Attorney's office deferred its opinion pending the outcome of this impossible to obtain Family Court decision for nearly one year.  This created a severely prejudicial stalemate between the Family Court and RIS processes resulting in significant delays in the review process which jeopardized Salvagno's parental rights, because under NYS Family law, the state agencies responsible for administering the foster care system may be required by law to commence termination of parental rights proceedings if a child remains in

foster care for a period of more than 15 months.  See paras 39 - 45, supra; PS 5050.49 at Sec 5 (b).  Again, it is noteworthy, that the DOJ OIG concluded that BOP does not provide adequate guidance to its staff regarding its criteria, that there is significant confusion, delays and ad hoc decision making at every stage of BOP's process, and that, as a result, eligible candidates for release not being considered and BOP fails to exercise its discretion. See paras 82 - 87, supra and Exhibit 17.

Fifth, that BOP lacks the special expertise, knowledge and competence to consider and make determinations on the above matters is further illustrated by the following (a) it established criteria requiring family court rulings that are impossible to obtain while incarcerated, which shows it lacks an understanding of NYS Family law and NYS Family Court rules and authority, (b) in August 2010, BOP and the US Attorney's Office represented to the sentencing court that ASjr was nowhere near ready for a kidney transplant in response to Salvagno's request for a furlough to provide his son with a kidney transplant.  Less than three months later he received transplant surgery.  This shows the US Attorney's Office and BOP not only grossly mis-assessed the boy's medical conditions and needs, but that they recklessly placed him at serious medical risk by doing so, because the statements they made (on matters in which they had no special expertise, knowledge or competence) were relied upon by the court to deny Salvagno's request, which left ASjr to receive an emergency, inferior non-living kidney donation which has a life span half that of a living donation and (c) in denying Salvagno's RIS request, BOP concluded that his criminal "conduct increased the likelihood of death or serious bodily injury to at least 468 victims, a number of whom were present in contaminated" buildings.  BOP has no special knowledge or expertise to make such a conclusion and it lacks a reliable and accurate scientific and medical basis to do so.  Such a finding was never made by the sentencing court nor by the Probation Department PSR, is contrary to evidence presented in the criminal case, and is affirmatively

refuted by new evidence that in the 27 years since the offense conduct commenced, which is beyond the latency period for asbestos, there have been no reportable injuries attributable to Salvagno's conduct.

Sixth, that BOP's process is effectively controlled by the US Attorney's office was testified by government witnesses at the Commission's hearing who stated that:

> "the US Attorney's office have ... come to play a key role in BOP's decision making process frequently discouraging filings that BOP might otherwise be inclined to make.  This is where a lot of cases get stuck ... I have heard from many people who handled cases where a case gets stuck in the US Attorney's office and is never heard from again.  The upshot is that what Congress intended as a judicially-administered safety valve, a word that appears three to four times in the legislative history, is instead controlled by an agency responsible for prosecutions". See para 84, supra; Exhibit 19 at 100-101.

Seventh, the record here supports the conclusion that the US Attorney's Office's effectively controlled BOP's denial.  The BOP warden recommended Salvagno's request be approved in April 2015, and the application was forwarded to BOP's General Counsel, who according to BOP's binding regulations was to determine whether the application warranted approval before soliciting the US Attorney's office's opinion.  However, in October 2015, about 14 months prior to her December 2016 decision, the BOP General Counsel deferred the matter to the US Attorney's office, who then proceeded to investigate facts relevant to BOP's criteria, deferred themselves to the Family Court proceedings which created an prolonged stalemate between the process of more than a year, and thereafter (presumably) rendered the conclusions which the General Counsel relied upon in her December 2016 denial.  See paras 13 - 51 supra.  This is contrary to BOP's regulations which provide that the General Counsel will solicit the opinion of the US Attorney only if and after the General Counsel determines that an inmate's request for compassionate release warrants approval.  See 28 CFR Sec 571.62(a)(2).

33

GROUND 2:   BOP FAILED TO EXERCISE ITS DISCRETION IN ACCORDANCE WITH THE
            RELEVANT STATUTES BY FAILING TO BRING A RIS MOTION WHERE SALVAGNO
            SQUARELY MEETS THE ELIGIBILITY ESTABLISHED BY CONGRESSIONAL
            DELEGATION TO THE COMMISSION

89.   Paragraphs 1-88, are incorporated by reference as though fully
stated and set forth herein.

90.   Congress expressly delegated to the Commission the expressed role
to decide the eligibility criteria that BOP must consider in exercising its
discretion to bring a RIS motion under Sec 3582(c)(1)(A)(i).  See paras 52 -
88, supra; see also 28 USC Sec 994(a) and (t).

91.   As relevant here, the Commission defined that criteria to exist in
cases involving "the death or inacapitation of the caregiver of the
defendant's minor child or children". Id; see also USSG Sec 1B1.13 (2016).

92.   Salvagno clearly met the eligibility criteria established by
Congressional delegation to the Commission for the appropriate use of the
sentence modification provisions of section 3582(c)(1)(A)(ii), because his
submissions established that the caregiver of his three minor children died.
See note 1, infra.

93.   Having squarely met this criteria, the proper exercise of its
discretion under the relevant statutes, necessitates that BOP promptly make
the RIS motion to the sentencing court, which "is in a unique position to
determine whether the circumstances warrant a reduction (and if so, the

---

1-  His submissions also established that the sentencing court
previously found on three separate occasions (after indictment, conviction
and sentencing) that he was "not a danger to the safety of any other person
or to the community, as provided in 18 USC 3142(g)".  See paras 13, supra;
see also US v Salvagno, USDC NDNY, 02-cr-51, Dkt Nos. 10 & 434.

amount of reduction), after considering the [Sec 3553(a)] factors". See e.g., USSG 1B1.13 n.4 (2016).

94.   BOP's authority to make a RIS motion is "not a roving license to ignore the statutory text" but instead a "direction to to exercise discretion within the statutory limits". Massachusetts v EPA, 549 US 497, 533 (2007).

95.   By failing to exercise its discretion in accordance with the relevant statutes, BOP abused its discretion.  See Ray v Robinson, 670 F.2d 474, 478 (3rd Cir 1981)("if [an agency] fails to exercise its discretion, that is itself an abuse of discretion").

GROUND 3:   BOP ABUSED ITS DISCRETION BY COMMITTING AN ERROR OF LAW
            AND BASING ITS DENIAL OF SALVAGNO'S REQUEST ON FACTORS WHICH
            CONGRESS DID NOT INTEND IT TO CONSIDER

96.   Paragraphs 1-95, are incorporated by reference as though fully stated and set forth herein.

97.   BOP denied Salvagno's RIS request based on the following three conclusions: first, his criminal "conduct increased the likelihood of death or serious bodily injury to at least 468 victims, a number of whom were present in contaminated elementary schools, churches and offices, and resulted in a total loss of $ 22,875,574.46"; second "two of [his] children are being cared for by their maternal uncle"; and third, "family court has directed that the third child remain in foster care". See Exhibit 13.

98.   BOP abused its discretion in reaching its decision, because its reasons for denying Salvagno's request were divorced from the criteria established by the Commission.

99.   Since the discretionary judgment contemplated by the relevant statutes asked only whether the caregiver for the inmates children had passed, the BOP could not rely on other reasons - such as whether the

35

inmate's offense created a potential risk of injury to buildings occupants, whether two of the inmate's three children were being temporarily cared for by their mother's death, or whether family court had order the inmate's third child to remain in foster care while the inmate remains incarcerated.

100.   BOP could only avoid bringing the requisite motion, in this case, if it found that the caregiver for the inmates child(ren) had not passed.

101.   As such, BOP abused its discretion by committing an error of law in considering factors which Congress did not intend for it to consider, which applied a more restrictive eligibility criteria than that established by the Commission and approved by Congress through the relevant statutes, and which BOP does not have the capacity or special expertise to assess.  See In re Sims, 534 F.3d 117, 132 (2nd Cir 2008)(abuse of discretion includes errors of law); see also Henley v FDA, 77 F.3d 616, 620 (2nd Cir 1995)(agency action "may be deemed arbitrary, capricious or an abuse of discretion if the agency has relied on factors which Congress has not intended it to consider").

GROUND 4:   BOP ABUSED ITS DISCRETION BY BASING ITS DECISION TO DENY
            SALVAGNO'S REQUEST ON CLEARLY ERRONEOUS FACTUAL FINDINGS AND
            OTHERWISE RELYING ON INACCURATE AND UNRELIABLE INFORMATION
            WHICH HE DID NOT HAVE AN OPPORTUNITY TO CORRECT

102.   Paragraphs 1-101, are incorporated by reference as though fully stated and set forth herein.

103.   Each of the three conclusions which formed the decisional basis of BOP's denial rested on clearly erroneous factual findings, relied upon materially inaccurate and unreliable information that Salvagno had no opportunity to correct, and is otherwise unsupportable.

105.   The following sufficiently establishes that BOP abused its discretion in denying Salvagno's RIS request, because its decision rests on clearly erroneous factual findings, by showing that it "failed to synthesize the evidence in a manner that accounts for conflicting evidence ...

incorrectly assessed the probative value of various pieces of evidence ... [and] failed to weigh all of the relevant evidence before making its factual findings", See US v Cerna, 603 F.3d 32 (2nd Cir 2010), and alternatively, that BOP's conclusions were based on materially inaccurate and unreliable information which Salvagno had no opportunity to correct.

A.    Likelihood of Injury

105.   The conclusion that Salvagno's "conduct increased the likelihood of death or serious bodily injury to at least 468 victims, a number of whom were present in contaminated" buildings is based on clearly erroneous factual findings and otherwise relies upon on materially inaccurate and unreliable information.

106.   Neither the sentencing court nor the PSR ever concluded that 468 people were placed at risk, or that any building occupants were placed at risk.  See note 2, infra.  Nor did they find that any specific number of persons were placed at risk.  They found instead that a 9-level enhancement was warranted because Salvagno's offense resulted in a risk to some of Salvagno's asbestos abatement employees without quantifying any specific number.  See note 3, infra.

---

2-  Indeed, any claim that Salvagno's offense placed building occupants at risk is baseless.  At sentencing, Salvagno's attorneys introduce evidence from representatives from the NYS Department of Health, who announced that there was no danger to members of the public because "Those living, working or learning in buildings where asbestos removal work was done improperly are not and have not been exposed to asbestos", Exhibit 23 at pg 9, and the government offered no evidence whatsoever to contradict the Health Department's conclusions.

3-  The PSR also stated that one of Salvagno's former workers had developed asbestosis, but at sentencing the government called Dr. Levin, who made that initial assessment.  He testified at sentencing that whatever was visible on that former employee's X-Ray, taken in 2000, could not have revealed the effects of his abatement work in 1994, because the latency period for asbestos related disease is 15-20 years, which conclusively established the government's claim that one of Salvagno's employees had already developed asbestosis due to his offense, was false.  Exhibit 24 at

37

107.  This finding was made following a sentencing hearing in which the government relied on the "expert testimony" of Dr. Levin, who estimated the fiber counts at AAR's worksites (despite admitting he has never actually seen asbestos abatement work, never measured fibers in the air during abatement work, and had no monitoring reports or other direct evidence of fiber counts corresponding to the abatement projects performed by AAR).  Exh 24 at pgs 26-85.  Dr. Levin then relied on his estimated fiber count (despite admitting that no risk predictions were valid unless fiber counts were known) to conclude that 20 of Salvagno's workers would develop lung cancer and 9 asbestosis. Id.

108.  The experts Salvagno called, relied on actual fiber counts taken from comparable projects, to conclude that the government's conclusions were in error by a factor of 100, and that the evidence supporting its risk conclusions was woefully inadequate.

109.  At that time, the evidence necessary to conclusively disprove the government's risk conclusion was not available (for various reasons, including that the 15-20 year latency period for asbestos related injuries had not yet been exhausted, and that there had never been a study of the health effects of asbestos on abatement workers) and the sentencing court credited the government's evidence. Id.

110.  But new evidence obtained since Salvagno's initial 2004 sentencing shows that the risk assessment was based on fiber estimate and risk assessment assumptions that were grossly unreliable and inaccurate.  In this regard, in the now more than 27 years since my criminal conduct commenced in

---

pgs 31-32).  It's also noteworthy that this employee, prior to working for AAR (Salvagno's abatement company) had a portion of a lung removed due to an extensive smoking illness, which Salvagno's experts opined was the likely source of the scarring visible on the x-ray.

1990 (well beyond the 15-20 year latency period for asbestos related injury) there have been no reported injuries actually attributable to Salvagno's offense.  See Exhibit 25.  This conclusively shows that the assumptions made by Dr. Levin concerning the estimate fiber count and corresponding risk analysis, which formed the basis of the 9-level risk enhancement and conclusion that 29 AAR workers would develop asbestos related injury, were grossly unreliable and inaccurate.

111.  This is the same conclusion reached by chief judge Scullen (USDC NDNY) in US v Thorn, an asbestos abatement prosecution involving the same prosecutor and expert testimony of Dr. Levin, who, instinctively found that Dr. Levin's testimony was speculative, ruling that "there was too much uncertainty in the evidence, both in terms of available medical evidence, as well as evidence of exposure in the present case". 317 F.3d 107, 118 (2nd Cir 2003); see also Exhibit 24 at pgs 56-57.

112.  Thus, not only has there never been a finding that any building occupant was ever placed at risk, nor a finding as to a specific number of AAR abatement workers placed at risk, but (a) the record established that "those living, working or learning in buildings where asbestos removal was done improperly are not and have not been exposed to asbestos, see Exhibit 23 at pg 9, and (b) newly obtained evidence that now exists -- i.e., that in the 27 years since Salvagno's offense conduct commenced in 1990, which is beyond the latency period for asbestos, there have been no injuries actually attributable to Salvagno's offense -- shows the risk prediction made at Salvagno's 2004 sentencing concerning his abatement workers was based on assumptions and facts that have with time, proved to be grossly unreliable and inaccurate.

B.    Two Children At Maternal Uncle

113.   The conclusion that "two of [Salvagno's] children are being cared for by their maternal uncle", who resides in Tennessee, is based on clearly erroneous factual findings, relies upon on materially inaccurate and unreliable information, and is otherwise unsupportable.   While both children were in his care, in May 2016, the maternal uncle determined he was no longer capable of caring for my youngest son (Nicholas) and thereafter placed him with a non-family member who resides in Georgia.   This information was provided to BOP in October 2016, two months prior to the Decision.

C.   Family Court Directive.

114.   The conclusion that "family court has dir%cted that the third child [Alex Jr] remain in foster care" is based on clearly erroneous factual findings, relies upon on materially inaccurate and unreliable information, and is otherwise unsupportable.

115.   Family Court did not order Alex Jr to remain in foster care permanently.   Instead, it placed him in foster care because there was no other option while Salvagno is incarcerated.   Importantly, it ruled on July 5, 2016 that, after considering Alex Jr's best interest, it adopts the reunification goal of returning Salvagno's son to him by Dec 2, 2016, and it thereafter continued that reunification goal.   Exhibit 9.

115.   Moreover, the Department of Children, Youth and Families (DCFY) stated during the Aug 24, 2016 Family Court proceeding that it believes Alex Jr's best interests would be served by leaving foster care as soon as possible and that it further believes the best chance for that to happen would be if Salvagno were granted compassionate release so he could return to the community and take his son back into his custody.   Exhibit 11 at pg 3.

D.   Lack Of Prior Notice And Opportunity To Correct

117.   Salvagno  was never informed of, nor provided an opportunity to

40

challenge or correct, the information and or conclusions that formed the basis of BOP's denial before the decision was reached.

GROUND 5:   BOP ABUSED ITS DISCRETION IN FAILING TO FOLLOW ITS OWN REGULATIONS BY DEFERRING TO THE US ATTORNEY BEFORE MAKING ITS DECISION

118.   Paragraphs 1-117, are incorporated by reference as though fully stated and set forth herein.

119.   The BOP warden recommended Salvagno's request be approved in April 2015, and the application was forwarded to BOP's General Counsel, who according to BOP's binding regulations was to determine whether the application warranted approval before soliciting the US Attorney's office's opinion.  See 28 CFR Sec 571.62(a).

120.   However, in October 2015, about 14 months prior to her December 2016 decision, the General Counsel deferred the matter to the US Attorney's office, which conducted fact-finding, deferred itself to the Family Court proceedings, which created a prolonged stalemate between the process of more than a year, and is believed to have rendered its opinion inclusive of the conclusions which the General Counsel relied upon to deny Salvagno's request. See paras 19 - 51, supra.

121.   This is contrary to BOP's regulations which provide that the General Counsel will solicit the opinion of the US Attorney only if and after the General Counsel determines that an inmate's request for compassionate release warrants approval.  See 28 CFR Sec 571.62(a)(2), which states:

> "If the General Counsel determines that the request warrant approval, the General Counsel shall solicit the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division ... [and] the opinion of the United States Attorney in the district in which the inmate was sentenced.  With these opinions, the General Counsel shall forward the entire matter to the Director, Bureau of Prisons, for final decision".

122.   It is well settled that "[a]n agency of the government must

41

scrupulously observe its own rules, regulations and procedures", Blassingame v Sec of Navy, 866 F.2d 556, 560 (2nd Cir 1998), and an "agency's failure to follow its own binding regulations is a reversible abuse of discretion". Carter v Sullivan, 909 F.2d 1201, 1202 (8th Cir 1990).

123.  Development of this issue may lead to the realization that the BOP also failed to exercise independent judgment on the relevant factors by deferring entirely or relying too heavily on the US Attorney's Office's conclusion, or that BOP improperly subdelegated its responsibilities to the US Attorney's office by impermissibly shifting to that agency almost the entire determination of whether Salvagno's circumstances satisfied a specific requirement, which would present additional issues requiring reversal. See e.g., Fund For Animals v Kempthorne, 538 F.3d 124 (2nd Cir 2007) (subdelegation to a non-subordinate officer or agency, i.e., an outside party, absent statutory authorization, is impermissible); see also Trowell v Beeler, 135 Fed Appx 590 (4th Cir 2004(finding BOP abdicated its statutory responsibility to bring independent judgment to bear on the matter by effectively delegating its statutory responsibilities to others).

GROUND 6:  THE ABOVE ACTS AND OMISSIONS VIOLATE THE CONSTITUTION'S
           SEPARATION OF POWERS PRINCIPLES AND DUE PROCESS CLAUSE

124.  Paragraphs 1-123, are incorporated by reference as though fully stated and set forth herein.

125.  Through the above actions and omissions, in their totality, the BOP usurped the judiciary's sentencing functions and Congress' legislative authority in violation of the Constitution's separation of powers principles, unreasonably denied and failed to give Salvagno's request full and fair consideration, acted arbitrarily, capriciously and in excess of its authority, and effected an unconstitutional impediment to the availability of review and reduction of Salvagno's sentence for "extraordinary and compelling

reasons" pursuant to what Congress intended as a judicially-administered "safety valve" when it passed 18 USC 3582(c)(1)(A)(i) and 28 USC 994 - in violation of Salvagno's due process rights.

REQUESTED RELIEF

126.   First Prayer of Relief (Grounds 1-3 & 6).  Salvagno requests the Court order BOP to (a) reconsider his RIS request; (b) in making this determination, act in accordance with the policy, criteria and examples established by the Commission under 28 USC Sec 994 and USSG 1B1.13(b)(2016), and disregard its own policy (including PS 5050.49), rules and criteria based on its current interpretation of the relevant statutes; (c) submit to the Court a detailed explanation of the procedure used and the reasons why the particular determination was reached; (d) as time is of the essence, make this determination promptly, and, in no event, later than ten (10) days from the date of the order; and (e) immediately discharge Salvagno in the case of non-compliance. See e.g., Billiteri v US Bd. of Parole, 541 F.2d 938, 944 (2nd Cir 1976)(noting that it is within the court's power to "order the Board [of Parole] to correct the abuses or wrongful conduct within a fixed period of time, after which, in the case of non-compliance, the court can grant the writ of habeas corpus and order the prisoner discharged from custody").

127.   Second Prayer of Relief (Grounds 4 & 5).  Salvagno requests the Court to order (a) an evidentiary hearing and discovery to afford Salvagno an opportunity to establish that the conclusions which formed the basis of BOP's Decision (1) were based on materially inaccurate and unreliable information that Salvagno had no prior opportunity to contest (2) involved investigation and assessment of matters, which are not within the special expertise, knowledge, competence or discretion of either BOP or the US Attorney's office, and which lacked a reliable medical and scientific basis; and (b) BOP to thereafter (1) reconsider his RIS request; (2) in making this

determination, exercise independent judgment, and disregard materially inaccurate and unreliable information and conclusions which are not within its (or the US Attorney's office's) special expertise, knowledge, competence, or discretion to make, or which lack a reliable scientific and medical basis; (3) submit to the Court a detailed explanation of the procedure used and the reasons why the particular determination was reached; (4) as time is of the essence, make this determination promptly, and, in no event, later than ten (10) days from the date of the order; and (5) immediately discharge Salvagno in the case of non-compliance.

128.   Third Prayer of Relief.  Salvagno, who is acting pro se, requests the Court liberally construe his submissions to raise the strongest argument they suggest, invoke any other jurisdiction necessary (e.g., mandamus, etc) to provide the requested relief, appoint counsel, expedite review and determination of this Petition, and order any other relief which is deemed just and fair.

## REASONABLE PROBABILITY THAT REQUESTED RELIEF WILL RESULT IN A DIFFERENT OUTCOME

129.   There is reason to believe that the requested relief will result in a different outcome, where (a) Salvagno's meet the threshold criteria to warrant the filing of the RIS motion established pursuant to Congressional delegation to the Commission; (b) the information and assumptions that formed BOP's decisional basis are unreliable and materially inaccurate; (c) new evidence reveals a grave infirmity in the risk assessment evidence relied upon by the sentencing court at Salvagno's initial sentencing, where the estimates and conclusions offered by the government have proved false with the passage of time; and (d) this Court has facilities, procedures and institutional protections to effectively address the difficult issues contained herein, whereas the BOP process afforded no prior notice nor opportunity to be heard to contest information that BOP relied upon to form

44

its decision.

130.   Although BOP's policy and rules do not formally provide for reconsideration, a recent decision in US v DiMasi, 2016 US Dist Lexis 160284 (D. Ma), reveals that after several denials of inmate Sal DiMasi's RIS request, BOP General Counsel meet with his counsel, provided more process, reconsidered his request and granted his request to file a RIS motion that led to his sentence reduction in Nov 2016.   It is noteworthy that the Court in DiMasi voiced concerns as to whether DiMasi, who was the former speaker of the house for the Massachusetts Legislature, was given preferential treatment based on his status and that of those advocating on his behalf.

131.   Affording a petitioner's counsel an opportunity to ensure that BOP relies upon accurate information in its RIS determination, was expressly raised at the Commission's 2/17/16 hearing on compassionate release by Marianne Mariano (Fed. Pub. Def's Off., WDNY) who testified that "the BOP should be encouraged to solicit information from ... defense counsel, before declining to seek a reduction for an inmate.   [It] collects information from the US Attorney ... when making this life-and-death decision on whether an individual meets the criteria for compassionate release ... counsel can confirm, clarify or refute information provided by the prosecutor, or contained in the PSR ensuring that the BOP has accurate information upon which to base its decision.   As the process stands now, there are horrible inequities".   Exhibit 19 (pgs 110-111).

132.   BOP solicited information from the US Attorney's Office NDNY for Salvagno's RIS.   However, the AUSA who prosecuted his case (AUSA Craig Benedict) resigned after having been found to have engaged in prosecutorial misconduct on asbestos prosecutions by the Court of Appeals (2nd Cir), and the AUSA that gathered information for BOP (AUSA Elizabeth Coombe), who is presumably a very competent attorney, was not involved in his criminal case, and therefore does not have extensive, first-hand knowledge of the

infirmities of proof concerning the abatement worker risk assessment issues. His prior sentencing counsel, Richard Asche, however, does have extensive, first-hand knowledge of the infirmities of proof in the assumptions that were made by the government's expert to support the risk assessment, which have proved grossly unreliable and inaccurate with the passage of time. Exhibit 25.  Mr. Asche, with his extensive knowledge on this issue (as clearly evinced in the sentencing memorandum he prepared, see Exhibit 24), and Mr. Howard, with his knowledge of the family court issues, would be able to clarify the issues and refute the information provided to BOP so as to ensure its decision is based on accurate information.

## MISCARRIAGE OF JUSTICE

133.  Denial would constitute a miscarriage of justice because (a) Congress intended 3582(c) to apply broadly, "regardless of the length of sentence, in the unusual case in which a defendant's circumstances are so changed ... that it would be inequitable to continue the prisoner's confinement". See Sen. Rp't. 98-225, at 121 (98th Cong., 1st Sess)(1984); (b) such circumstances, by operation of related statute 28 USC USC 994, include the death of the caregiver of the defendant's minor children, where the defendant is not a danger to the safety of any other person or the community; (c) Salvagno's circumstances meet the criteria to warrant the RIS motion being filed so the sentencing court can determine whether his clarified circumstances warrant a sentence reduction; (d) after a 22 month review process, Salvagno and his children were denied fair consideration due to materially inaccurate information which he had no notice of or opportunity to challenge; (e) following his wife's passing, his children have been separated at great distances from him and each other; (f) Alex Jr suffers from severe medical and developmental issues; and (g) Family Court and DCYF determined that, given Alex Jr's severe disabilities, it would be in his best interest to leave foster care as soon as possible, and that the best opportunity for

that to happen is for Salvagno's RIS request to be granted so he can return to the community as quickly as possible, retake custody, and provide for ASjr's special needs.

CONCLUSION

Wherefore, for good cause having been shown the Court should grant the requested relief.

VERIFICATION

I, Alex Salvagno, declare under penalty of perjury pursuant to 28 USC Sec 1746 that the foregoing assertions are true and correct to the best of my knowledge and belief.

Respectfully Submitted


Alex Salvagno